FILED by AW D.C.

Dec 14, 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

17-20883-CR-WILLIAMS/TORRES

CASE NO. _____

18 U.S.C. § 371
18 U.S.C. § 981(a)(1)(C)

UNITED STATES OF AMERICA

vs.

JOHN AHEARN and
ANDREW H. WILSON,

       **Defendants.**
_____/

## INFORMATION

The Attorney for the United States of America charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

1. Manhattan Transfer Registrar Co. ("Manhattan Transfer") was a transfer agent with offices in Miller Place, New York and Erie, Colorado, that was registered with the U.S. Securities and Exchange Commission ("SEC").

2. Defendant **JOHN AHEARN** was the senior partner of Manhattan Transfer, and resided in Erie, Colorado.

3. Defendant **ANDREW H. WILSON** was an attorney licensed to practice law in the State of California, and resided in Nevada City, California.

4. Steven Sanders was a resident of Lake Worth, Florida, and acted as a promoter for companies that were registered to do business in the State of Florida.

5. Daniel McKelvey was a resident of Foster City, California, and acted as a promoter for companies that were registered to do business in the State of Florida.

6. Jeffrey Lamson was a resident of Sacramento, California, and acted as a promoter and recruiter of officers for companies that were registered to do business in the State of Florida.

7. Myron Gushlak was a Canadian citizen who resided in the Cayman Islands and, subsequently, was an inmate at the federal correctional institution in Allenwood, Pennsylvania.

8. David Lubin was an attorney licensed to practice law in the State of New York, and acted as a promoter for the purchase and sale of public companies.

9. James M. Schneider was an attorney licensed to practice law in the State of Florida who conducted business in Boca Raton, Florida.

10. Attorney A was an attorney in Vancouver, Canada who acted as a promoter for the purchase and sale of public companies.

11. Medford Financial Ltd. a/k/a "Medford Financial Group" ("Medford") was a purported Belize corporation controlled by Myron Gushlak.

12. The SEC was an agency of the United States responsible for enforcing the securities laws. Regulations promulgated by the SEC defined and implemented the requirements of the statutes.

13. Shares of public companies (known as "issuers") that were not registered with the SEC generally could not be sold to the public. Such shares were generally considered "restricted." However, Rule 144 of the regulations promulgated by the SEC permitted the sale of restricted securities in certain circumstances. One of the requirements of Rule 144 was that the seller of the securities not be an "affiliate." An "affiliate" was a person who directly, or indirectly through one or more intermediaries, controlled, or was controlled by, or was under

common control with, the issuer.   Control meant the power to direct the management and policies of the company in question, whether through the ownership of voting securities, by contract, or otherwise.   If securities were purchased from a controlling person or "affiliate," then the buyer received restricted securities, even if they were not restricted in the affiliate's hands.   Shares that were not "restricted" generally were considered "free trading."

14.   Transfer agents were required to register with the SEC, and record changes of share ownership, maintain the issuer's security holder records, cancel and issue share certificates, and distribute dividends.   Transfer agents acted as intermediaries between issuing companies and security holders, and were necessary for the successful completion of secondary securities trades.

15.   Before a transfer agent would designate previously restricted securities as unrestricted under Rule 144, the transfer agent typically required a legal opinion letter from an attorney stating that the requirements of Rule 144 had been met.   A securities broker typically required a similar letter before it would accept such shares for deposit and sale to the public.

16.   Entertainment Art, Inc. ("EERT"); Intake Communications, Inc. ("Intake"); mLight Tech, Inc. ("mLight"); BlueFlash Communications, Inc. ("BlueFlash"); Blue Sun Media, Inc. ("Blue Sun"); and, Big Clix, Corp. ("Big Clix") were issuers that filed periodic reports with the SEC (collectively, "the issuers").   The issuers were sometimes referred to as "pubcos," "public vehicles" or "shells."

17.   A "straw CEO" was an individual who, in exchange for a fee, allowed his name to be listed as a chief executive officer and corporate shareholder on paperwork and in public filings. A "straw shareholder" was an individual who, in exchange for a promised fixed return, gave control of shares listed in his name to an undisclosed principal.

3

18. In a "reverse merger," a private company acquired a majority of the shares of a public company, which was then merged with the purchasing entity. The public company was required to report the terms of a reverse merger in a filing with the SEC.

19. "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which had a low market capitalization. Microcap stocks were often traded via the Over the Counter Bulletin Board ("OTCBB") or pink sheet markets. These stocks were susceptible to manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

20. A "pump and dump" was a stock manipulation scheme where one or more individuals who controlled the purported free trading shares of a microcap company, and fraudulently inflated the share price and trading volume of the company through, among other things, manipulative trading techniques, false and misleading press releases, and paid stock promotions. When the company's share price reached desirable levels, the free trading shares were sold for substantial financial gain.

## CONSPIRACY TO UNLAWFULLY SELL UNREGISTERED SECURITIES
## (18 U.S.C. § 371)

From in or around January 2007, through in or around January 2014, in Miami-Dade, Broward, and Palm Beach Counties, in the Southern District of Florida, and elsewhere, the defendants,

**JOHN AHEARN and**
**ANDREW H. WILSON,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with Steven Sanders, Daniel McKelvey, Jeffrey Lamson, David Lubin, Myron Gushlak, James M. Schneider, Attorney A, and others known and unknown to the Attorney for the United States, to commit certain offenses against the United States, that is: (a) to knowingly, willfully, and unlawfully, directly and indirectly, use any means and instruments of transportation and communication in interstate commerce and the mails, to sell securities, through the use and medium of any prospectus and otherwise; and (b) to knowingly, willfully, and unlawfully carry and cause to be carried through the mails and in interstate commerce, by any means and instruments of transportation, securities, for the purpose of sale and for delivery after sale, in violation of Title 15, United States Code, Sections 77e(a)(1), 77e(a)(2), and 77x, and Title 17, Code of Federal Regulations, Section 230.144.

## PURPOSE OF THE CONSPIRACY

21. It was a purpose of the conspiracy for the conspirators to unlawfully enrich themselves by creating public companies and registering them with the SEC using false and fraudulent statements in documents submitted to the SEC, so that the companies could issue shares which could be traded in the microcap and penny stock markets. The conspirators would then offer to sell the restricted shares and the free trading shares of the issuers to others, who would then utilize the free trading shares to engage in pump and dump stock swindles and other manipulation schemes.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the defendants and their conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

22. David Lubin, Steven Sanders, Daniel McKelvey, and others would recruit individuals to serve as straw CEOs for certain issuers. These conspirators would inform the straw

5

CEOs that they would have no further role with the company and would be paid when the company was later sold.

23.     David Lubin, Steven Sanders, Daniel McKelvey, and others would prepare false and fraudulent corporate documents for the issuers, such as board meeting minutes, stock certificates and shareholder lists. The conspirators would then submit these false and fraudulent documents and other false information to the SEC in order to obtain effective registration of the issuers.

24.     David Lubin, Steven Sanders, Daniel McKelvey, and others would recruit straw shareholders for the issuers and would assign a certain number of shares to each straw shareholder. In reality, the straw shareholders were promised a fixed amount of money once the company was ready to be sold, and the shares were in fact controlled by Sanders, McKelvey, and Mirman.

25.     For certain issuers, after the registration was deemed effective, David Lubin, Steven Sanders, and Daniel McKelvey would discuss with defendant **JOHN AHEARN** the nature of the issuer and request that Manhattan Transfer act as the transfer agent for the shares. From these conversations, **AHEARN** learned that some combination of Lubin, Sanders and McKelvey controlled the companies and all or nearly all of the shares, even though they were not listed as owners on corporate documents or share certificates.

26.     **JOHN AHEARN** agreed to assist David Lubin, Steven Sanders and Daniel McKelvey with their efforts to sell certain issuers to a buyer, in exchange for a fee to be paid if such a sale were completed. **AHEARN** knew that the sale of the entities would include all of the restricted and unrestricted shares, and that the unrestricted shares would continue to be incorrectly classified after the sale. **AHEARN** agreed to act as the transfer agent for these improperly classified shares with the expectation of receiving fees for transfer services in the future.

27. For certain issuers, **JOHN AHEARN** would also assist with filing reports with the SEC via the EDGAR filing system. These reports were authored by David Lubin, Steven Sanders and Daniel McKelvey, and were filed by **AHEARN** without any review or approval by the straw CEO or shareholders. The reports falsely described the share ownership of the companies and the role of the straw CEO, and did not disclose the role of the conspirators as control persons or beneficial owners of the shares.

28. For certain issuers for which **JOHN AHEARN** acted as transfer agent, **ANDREW H. WILSON** would execute opinion letters for the purpose of allowing restricted shares of the issuers to be classified as unrestricted and to be transferred, deposited with brokerages, and electronically traded. These opinion letters falsely and fraudulently represented that certain shares of the issuer were not owned or controlled by an "affiliate" of the issuer. **WILSON** executed these letters knowing that they would give the false impression that he had acted as counsel for the companies, and that the letters would be used by subsequent purchasers to deposit and sell shares that should be restricted. **WILSON** had no in-person or telephone conversations with any of the named officers or shareholders, and instead took all of his direction from Sanders and McKelvey. **WILSON** executed opinion letters with respect to EERT, BlueFlash, and mLight Tech, Inc., that contained such false and fraudulent representations.

29. **ANDREW H. WILSON** also provided escrow services for buyers who were purchasing all or nearly all of the shares of an issuer. In the case of Big Clix, on or about September 25, 2013, **WILSON** received a wire transfer into his attorney trust account of $187,677 from shell buyers. **WILSON** knew that these funds were used to "guarantee" that the buyer would purchase a predetermined number of shares in the open market from Sanders and McKelvey at a prearranged price, as part of an undisclosed purchase of all of the restricted and purported free

7

trading shares from Sanders and McKelvey. After the open market purchase occurred, **WILSON** returned the funds.

30. For EERT, Myron Gushlak purchased all of the restricted and purported free trading shares from David Lubin in approximately 2008, using purchase agreements that falsely described the share ownership and nature of the transaction. In or around November 2010, Gushlak began serving a federal sentence for a separate securities fraud scheme. Beginning in 2011, David Lubin, Steven Sanders, and Daniel McKelvey agreed to assist Gushlak with the sale of all of the restricted and purported free trading shares of EERT. The restricted shares were listed in the name of Medford to conceal Gushlak's ownership, and the purported free trading shares were listed in the names of straw shareholders. Since Gushlak was in prison, Sanders and McKelvey installed Jeffrey Lamson as the straw CEO of EERT and as the owner on paper of Medford.

31. **JOHN AHEARN** had been the transfer agent for EERT since approximately 2008, knowing that David Lubin created EERT using false and fraudulent paperwork. In 2011, Steven Sanders and Daniel McKelvey approached **AHEARN** to assist with transferring some of the restricted EERT shares to the name of McKelvey in a way that would give the false impression that the EERT shares were not restricted. **AHEARN** agreed to assist with the transfer of these shares but requested an attorney opinion letter for cover. McKelvey then approached **ANDREW H. WILSON** to request such a letter, and **WILSON** agreed to opine that McKelvey was not an affiliate of EERT, even though he knew that McKelvey and Steven Sanders exercised control over EERT. **WILSON** also took no steps to verify the status of the shares or to communicate with the named officer, Jeffrey Lamson. Thereafter, on about August 11, 2011, **WILSON** executed a letter that falsely represented that McKelvey acquired 1,485,000 shares of EERT "for investment and not for resale, transfer or hypothecation or redistribution," and that McKelvey "is not and at

the time of the purchase of the Shares was not an affiliate of the Company[.]" These representations were false.

32. After receiving the false opinion authored by **ANDREW H. WILSON** in relation to EERT, and receiving instructions from Daniel McKelvey and Steven Sanders as to how to transfer the shares, **JOHN AHEARN** transferred 1,485,000 shares of EERT to the name of an entity controlled by McKelvey. In or around July 2012, Sanders and McKelvey came to an agreement with Attorney A to sell all of the restricted and purported free trading shares of EERT for approximately $325,000. After being informed of the sale of EERT to Attorney A, **AHEARN** requested another opinion letter to provide cover for the transfer of the shares to the shareholders to be named by Attorney A. In response, **WILSON** executed a letter dated October 18, 2012, addressed to Jeffrey Lamson and **AHEARN**, that falsely stated that the opinion was relying on facts provided by the company, and that an exemption under Rule 144 allowed for the sale of the shares. In reality, **WILSON** had no contact with Lamson, and **WILSON** knew that the exemption to Rule 144 referenced in the letter did not apply.

33. On or about October 22, 2012, on the instructions of Sanders and McKelvey, and using the October 18, 2012 letter from **ANDREW H. WILSON** for cover, but without confirming or verifying that the named shareholders authorized the transfer of their shares, **JOHN AHEARN** caused all of the EERT shares to be transferred to names supplied by Attorney A. Also on or about October 22, 2012, **AHEARN** caused to be transmitted via Federal Express from Miller Place, New York, to Attorney A in Vancouver, British Columbia, copies of certain share certificates and corporate paperwork for EERT. At the time he sent the share certificates to Attorney A, **AHEARN** knew the shares were improperly classified as free trading when in reality they should have been restricted.

34. On or about October 22, 2012, James M. Schneider received approximately $324,060 into his attorney trust account at Sabadell United Bank, N.A. in Boca Raton, Florida, representing the proceeds transmitted by Attorney A for the EERT restricted and purported free trading shares. On or about October 23, 2012, Schneider disbursed the funds obtained from Attorney A on the instructions of Steven Sanders. Schneider disbursed the majority of the EERT proceeds to accounts controlled by Myron Gushlak, even though Schneider did not obtain approval from any of the named EERT shareholders or the named officer, Jeffrey Lamson, authorizing such disbursements. Schneider also disbursed sums to Sanders, Daniel McKelvey, **JOHN AHEARN**, **ANDREW H. WILSON** and himself for participation in the transaction.

35. Attorney A and the principals who purchased the EERT shares used the opinion letters from **ANDREW H. WILSON** to subsequently transfer and deposit the shares for trading. Shortly thereafter, the buyers caused a reverse merger of EERT with another entity and renamed it "Biozoom, Inc.," with ticker symbol "BIZM." Because the EERT shares had been previously fraudulently sold and classified as unrestricted, and were conveyed with false opinion letters among other false documents, the BIZM principals were in a position to engage in a pump and dump stock manipulation scheme using the EERT shares previously purchased from the conspirators.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purpose thereof, at least one conspirator committed and caused to be committed, in the Southern District of Florida, and elsewhere, at least one of the following overt acts, among others:

1. On or about October 20, 2012, Attorney A sent an email to **JOHN AHEARN**, copying Daniel McKelvey and Steven Sanders, to finalize details related to the sale of the restricted

and purported free trading shares of EERT, that was transmitted from Vancouver, Canada to Boca Raton, Florida and Erie, Colorado.

2. On or about October 23, 2012, Steven Sanders, James Schneider and **ANDREW H. WILSON** caused a wire transfer of $1,500 from a Sabadell Bank account ending in x-9646, in Boca Raton, Florida, to a Westamerica Bank account ending in x-0584, in Sausalito, California, in the name of Wilson Campilongo LLP, representing payment for an opinion letter related to shares of EERT.

3. On or about October 23, 2012, Steven Sanders, James Schneider and **JOHN AHEARN** caused a wire transfer of $2,125 from a Sabadell Bank account ending in x-9646 in Boca Raton, Florida, to a Chase Bank account ending in x-0021, in Miller Place, New York, in the name of Manhattan Transfer Registrar Company, representing payment for transfer services for EERT.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE
## (18 U.S.C. § 981(a)(1)(C))

1. The allegations of this Information are realleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendants have an interest.

2. Upon conviction of the violation alleged in this Information, the defendants shall forfeit to the United States, any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 28, United States Code, Section 2461.

_____, Acting Chief, CR-AV.
RANDY A. HUMMEL
ATTORNEY FOR THE UNITED STATES,
ACTING UNDER AUTHORITY
CONFERRED BY 28 U.S.C. § 515

_____
JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| JOHN AHEARN and<br>ANDREW H. WILSON, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| **Defendants.**<br>_____/ | Superseding Case Information: |

**Court Division:** (Select One)

| | | | | New Defendant(s) | Yes ____ No ____ |
|---|---|---|---|---|---|
| X | Miami | ____ | Key West | Number of New Defendants | ____ |
| ____ | FTL | ____ | WPB ____ FTP | Total number of counts | ____ |

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)    NO
   List language and/or dialect    _____

4. This case will take  0  days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                        (Check only one)

   | I   | 0 to 5 days       | X    | Petty    | ____ |
   |-----|-------------------|------|----------|------|
   | II  | 6 to 10 days      | ____ | Minor    | ____ |
   | II  | 11 to 20 days     | ____ | Misdem.  | ____ |
   | IV  | 21 to 60 days     | ____ | Felony   | X    |
   | V:  | 61 days and over  |      |          |      |

6. Has this case been previously filed in this District Court?   (Yes or No)   No
   If yes:
   Judge: _____  Case No. _____

   Has a complaint been filed in this matter?   (Yes or No)   No
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____   District of _____

   Is this a potential death penalty case? (Yes or No)   No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ____ Yes   X No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ____ Yes   X No

_____
JERROB DUFFY
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. A5501106

*Penalty Sheet(s) attached                                                                        REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: JOHN AHEARN

**Case No**: _____

Count #: 1

Conspiracy to Unlawfully Sell Unregistered Securities

Title 18, United States Code, Section 371

\* **Max. Penalty**:    Five (5) years' imprisonment

Count #:

\*Max. Penalty:

Count #:

\*Max. Penalty:

Count #:

\*Max. Penalty:

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: ANDREW H. WILSON

**Case No**: _____

Count #: 1

Conspiracy to Unlawfully Sell Unregistered Securities

Title 18, United States Code, Section 371

\* **Max. Penalty**:     Five (5) years' imprisonment

Count #:



\*Max. Penalty:

Count #:



\*Max. Penalty:

Count #:



\*Max. Penalty:

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) Case No. |
| John Ahearn, | ) |
| | ) |
| Defendant | ) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| Andrew H. Wilson, | ) | |
| | ) | |
| Defendant | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*